UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

**ANTONIO BRUNO, SR.**,

                            Petitioner,

      – against –

**R. COVENY**, *Superintendent*,

                         Respondent.

-------------------------------------------------------------X

**MEMORANDUM
DECISION & ORDER**

18-CV-1522 (AMD)

**ANN M. DONNELLY**, United States District Judge:

        The *pro se* petitioner, currently incarcerated at Attica Correctional Facility, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The petitioner was convicted after a jury trial of manslaughter in the first degree (N.Y. Penal Law § 125.20(1)) and sentenced as a predicate violent felon to a determinate prison term of 22 years followed by five years of post-release supervision.  The petitioner argues that his conviction was against the weight of the evidence, and that the trial court violated due process and his right to a fair trial when it permitted evidence of uncharged crimes and allowed the prosecutor to introduce the petitioner's post-arrest statements as "rebuttal evidence."  (ECF No. 1 at 11, 50, 64.)  In addition, the petitioner faults the trial court's final instructions to the jury, and argues that his sentence was "excessive," that his manslaughter conviction violates double jeopardy, and that he was denied the effective assistance of appellate counsel.  (ECF No. 1 at 70, 79, 84-86.)  For the reasons that follow, the petition is denied.

## FACTUAL BACKGROUND[1]

### I.   Overview

On November 12, 2007, the petitioner stabbed William Rosario in the chest with a knife

and killed him.  A grand jury charged him with murder in the second degree, manslaughter in the

first degree, and criminal possession of a weapon in the fourth degree.  The petitioner went to

trial before the Honorable Danny K. Chun and a jury on September 17, 2008.  The jury acquitted

the petitioner of second degree murder and convicted him of first degree manslaughter.

### II.   Pre-Trial Proceedings

Prior to trial, Judge Chun held a hearing on the petitioner's motion to suppress his post-

arrest statements.  (ECF No. 7-1.)[2]

Officer Julia Beskin rode with the petitioner in an ambulance to Methodist Hospital.

(ECF No. 7-1 at 80.)  The petitioner was "screaming and cursing," and called her a "bitch" and a

"pig."  (*Id.*)  Once in the emergency room he continued to scream "non-stop."  (*Id.* at 81.)  He

"wanted to know what happened saying that he couldn't recall anything.  He couldn't understand

why he was handcuffed and why [Officer Beskin] was even with him and what happened to his

face."  (*Id.*)  When a medical provider asked Officer Beskin if the petitioner was involved in the

stabbing, the petitioner "wanted to know which one of the two males that he was involved with

in a fight was stabbed and whether it was the younger or the older brother."  (*Id.* at 82-83.)  He

told Officer Beskin that "he was walking by, that the words were exchanged with the parties and

---

[1] Because the petitioner was convicted, the facts are summarized in the light most favorable to the verdict. *See Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012).  The facts are drawn from the full record of the state court proceeding.

[2] The petitioner also moved to suppress physical evidence, including his clothing and cell phone, arguing that they were seized pursuant to an unlawful arrest.  (ECF No. 7-1 at 94-96.)

they got into a physical altercation.  At which point, he didn't recall anything but being hit on the head and waking up with the police around him."  (*Id*. at 83.)

The petitioner was taken to the 78th precinct and placed in an interview room. (ECF No. 7-1 at 28.)  As Detective Thomas Markardt began to advise him of his rights, the petitioner interrupted, saying that:

> [H]e knew his rights and that he was walking down the street and five drunken Mexicans assaulted him and he's a man and he did what he had to do.  He was placed in a choke hold, struck over the head with a bottle and when he woke up there was someone [l]ying next to him.  He was handcuffed.  The police were on the scene.  He was taken to Methodist Hospital.  He didn't understand why he was being treated like a criminal and that he didn't have anything else to say until [he] spoke with his attorney.

(*Id*. at 31-32.)  At that point Detective Markardt ended the interview and took the petitioner to a holding cell.  (*Id*. at 33.)  A short time later, Detective Markardt overheard the petitioner tell Police Officer Julio Franco, whose desk was near the holding cell, that he could "go four years standing on his head," and he could "do push-ups . . . all day long."  (*Id*. at 34.)  Detective Markardt observed that the petitioner was "very angry," and was "screaming" and "yelling." (*Id*.)

Judge Chun denied the motion to suppress.  (ECF No. 7-1 at 105, 107, 121.)  He determined that there was probable cause to arrest the petitioner, and that all his statements were "spontaneous" and "voluntary."  (*Id*. at 106-07.)

The prosecution made an application pursuant to *People v. Molineaux*, 168 N.Y. 264 (1901), to introduce evidence of the petitioner's prior uncharged crimes and bad acts.  The prosecutor asked to introduce evidence that the petitioner was a member of the Cash Money Boys gang, a subset of the Bloods, that he was a known drug dealer and that Jonathan Burgos and Alex Santiago sold drugs for him, and that the petitioner held a knife to a teenager's throat and threatened him a week before the stabbing.  (*Id*. at 46-48.)  She also sought permission to

introduce evidence that nine years before the stabbing the petitioner beat a much larger man into unconsciousness.  (*Id*. at 48.)  She explained that this evidence was probative of the petitioner's motive and relevant to establish that the petitioner was the "big homie" who "runs the block." (*Id*. at 43, 48.)  Evidence of these acts would also "complete the narrative" by establishing the relationship between the petitioner and the witnesses.  (*Id*. at 49.)  Defense counsel opposed the application, and argued that there was no evidence that the killing was gang related or connected to narcotics, and that the evidence was being offered merely to demonstrate the petitioner's propensity for violence.  (*Id*. at 56-59.)

Judge Chun denied the applications to introduce evidence of the beating and evidence of the petitioner's membership in the Bloods.  He permitted the evidence that the petitioner was known to be a member of the Cash Money Boys, and that he sold drugs with Burgos and Santiago.  (*Id*. at 66-67.)  He also granted the application to introduce evidence of the knifepoint threat a week before the stabbing.  (*Id*. at 67.)  Judge Chun explained that the evidence of the petitioner's gang membership, his relationship to Burgos and Santiago, and his threat to the teenager "completed the narrative" and explained the relationships among the various people; the evidence showed that the petitioner was the "big homie or the person who runs the block" and that he was called to provide "protection" or "punish[ment]" if someone was "messing with his under[lings]."  (*Id*. at 68.)

In its application pursuant to *People v. Sandoval*, 34 N.Y.2d 371 (1974), the prosecution sought to cross-examine the petitioner about the following aspects of his criminal record if he elected to testify: a 1995 youthful offender adjudication for selling drugs to an undercover officer, a 2001 conviction for possession of a loaded firearm, a 2001 conviction for second degree assault during a robbery in which the victim was stabbed and beaten with a baseball bat,

4

and convictions in 2003 and 2004 for selling drugs. (*Id*. at 59-62.) The prosecutor also sought to question the petitioner about disciplinary infractions at Rikers Island. (*Id*. at 63.) Defense counsel responded that none of the petitioner's prior convictions were probative of credibility and would be unduly prejudicial. (*Id*. at 64-66.)

Judge Chun ruled that if the petitioner chose to testify, the prosecutor could ask: whether he had been convicted of a felony in January of 2001, and whether he was in possession of a loaded firearm in that case; whether he was convicted of another felony in June of 2001, but not about the underlying facts; and whether he had a felony drug conviction in 2004 as well as the underlying facts of that case. (*Id*. at 71-72.) In addition, Judge Chun permitted the prosecutor to cross-examine the petitioner about the beating from nine years earlier. (*Id*. at 73.) Judge Chun precluded inquiry into the petitioner's 2003 conviction, the youthful offender adjudication, and the prison infractions. (*Id*.)

## III. Trial

### a. The Prosecution's case

The prosecution called 31 witnesses at trial and established the following facts:

On the evening of November 12, 2007, William Rosario took his fiancé and two daughters bowling at Melody Lanes in Sunset Park, Brooklyn. (Tr. at 140, 253, 729.)[3] Rosario's cousins—22 year-old Javier Aquino and 15 year-old Valerie Aquino—were there, as was Rosario's brother Dario Algarin. (*Id*. at 140, 253, 452, 729.) The group bowled for a few hours and then walked up 5th Avenue towards the Aquinos' apartment on 12th Street in Park Slope. (*Id*. at 142, 250, 254, 454, 731.) As they approached 14th Street and 5th Avenue, Jonathan Burgos, a teenage friend of Javier Aquino's, rode up on a bike. (*Id*. at 260, 456, 731.) Javier

---

[3] The transcript of the trial ("Tr.") can be found at ECF Nos. 7-2, 7-3 and 41-1.

nodded at him, but Rosario, who did not live in Park Slope and did not know Burgos, exchanged "looks" with the teen, and the two argued briefly.  (*Id*. at 260, 456, 732.)  Burgos said, "I'll be back. I'm going to call you know who," and rode away.  (*Id*. at 732-33.)  Rosario, Algarin and the Aquinos went into a deli on 13th Street and 5th Avenue to buy some beer, while Rosario's fiancé and daughters went home in a cab.  (*Id*. at 146, 257, 262, 734.)

While they were inside the store, Rosario, Algarin and Javier Aquino argued with Burgos's older brother, Tommy.  (*Id*. at 263, 458, 735.)  As they left the deli, a group of teenage boys, including Burgos, confronted them.  (*Id*. at 263, 459, 736.)  One of the boys—Alex Santiago—had an aluminum baseball bat and was swinging it as if he was going to hit somebody.  (*Id*. at 264-66, 460, 736.)  Javier asked Santiago if there was anything he could do to "squash this," and Santiago replied, "No, you're done. Your whole fuckin' family is done."  (*Id*. at 736.)  Rosario and Javier stepped toward Santiago, and Algarin threw a beer bottle at Santiago but did not hit him.  (*Id*. at 461, 736.)  The teens ran away, and Santiago called out, "Your whole fuckin' family is dead.  It's a wrap.  I called you know who . . . I called my old homey . . . When Ton' comes, it's a wrap."  (*Id*. at 738.)

Rosario, Algarin and Javier Aquino walked in the opposite direction up 12th Street.  (*Id*. at 461, 739.)  Valerie Aquino got her mother, who was at a friend's apartment on 12th Street, and they returned to their building where Mrs. Aquino called 9-1-1 about the confrontation outside the deli.  (*Id*. at 176.)  Valerie, Javier and their mother spoke with the police, and then went inside.  (*Id*. at 177, 740.)  Rosario and Algarin stood outside the Aquinos' building, talking and drinking beer.  (*Id*. at 269, 463, 656.)

At approximately 10:00 p.m., the petitioner walked up and asked Rosario and Algarin whether they had a "beef" with his "little brother."  (*Id*. at 464, 656-57.)  He told them, "I'm the

6

big homie," pulled out a knife, and started swinging it.  (*Id*. at 464-65.)  Notified by neighbors of

the confrontation between his cousins and the petitioner, Javier Aquino went outside and saw the

petitioner—who had a reputation for threatening people and was a member of a gang called the

Cash Money Boys—facing his cousins, who had their backs against a wall.  (*Id*. at 734, 742-

43.)[4]  Javier asked the petitioner if there was anything he could do, but the petitioner refused to

back down and kept swinging the knife, so Javier told Rosario and Algarin that one of the three

of them would have to try to take the petitioner's knife.  (*Id*. at 743-44.)  Javier was worried that

if he left, the petitioner would "still come and attack [him]," and that the petitioner was "too

aggressive" for him "to just turn around and leave."  (*Id*. at 746.)

The petitioner walked backwards down 12th Street, still swinging the knife.  (*Id*. at 588,

695, 747.)  He told Javier, "You know me; you know what I could do. It's a wrap for yous. You

know how I am . . . Yous are all dead."  (*Id*. at 747).  Algarin threw a beer bottle at the petitioner

but did not hit him; Javier threw garbage bags.  (*Id*. at 466, 746-48.)  As Javier ran around some

parked cars, Rosario tried to grab the knife, and the petitioner cut his left sleeve.  (*Id*. at 472.)

The petitioner then lunged at Rosario and stabbed him in the chest.  (*Id*. at 478.)  As Rosario fell,

Javier grabbed the petitioner from behind and put him in a headlock.  (*Id*. at 748-49.)  Javier's

father—who arrived after hearing shouting on the street—grabbed the knife from the petitioner's

hand, cutting himself in the process.  (*Id*. at 416-17, 749.)  Javier and Algarin forced the

petitioner to the ground, and Algarin kicked the petitioner in the head.  (*Id*. at 210, 214, 479,

754.)

Valerie Aquino flagged down a passing police car.  (*Id*. at 280-81.)  Police Officers Jean

Rodriguez and Christopher Ierardi saw Rosario lying on the ground, bleeding from a chest

---

[4] Other witnesses testified that a week earlier the petitioner held a knife to a teenage boy's throat, told him, "Don't fuck with my money," and then punched him in the face.  (Tr. at 218, 275-76, 423.)

wound; Javier and Algarin were "stomping" on the petitioner.  (*Id*. at 380-81, 544.)  The officers

ordered Javier and Algarin to back away and took the petitioner into custody.  (*Id*. at 215, 475,

546.)  Officers also vouchered the petitioner's bloody knife.  (*Id*. at 67.)

Officer Julia Beskin rode with the petitioner to Methodist Hospital.  (*Id*. at 838.)  The

petitioner was "very upset," "screaming," "cursing" and "just being belligerent."  (*Id*.)  He was

treated for bruises and cuts to his face and hands.  (*Id*. at 533, 841-42.)  The petitioner was then

taken to the 78th precinct, and placed in a holding cell.  (*Id*. at 615.)  According to Officer Julio

Franco and Detective Markardt, the petitioner was still "upset" the next morning, and was

"pacing back and forth" in his cell, "muttering stuff."  (*Id*. at 847.)  At one point the petitioner

stated: "I could do four years standing on my head. I could do push-ups all day long."  (*Id*.)[5]

Dr. Frede Frederic of the Office of Chief Medical Examiner performed William

Rosario's autopsy.  (*Id*. at 709.)  Rosario died from a single stab wound to the chest; the knife

penetrated three and a half inches into his chest, breaking his sternum and cutting his pulmonary

artery, which caused him to bleed to death.  (*Id*. at 710.)  He also had a superficial wound on his

hand that was consistent with a defensive wound.  (*Id*. at 716.)  Forensic tests established that the

petitioner's and Rosario's DNA were on the knife, and that Rosario's blood was on the

petitioner's clothes.  (*Id*. at 355, 362, 367-68, 888.)

---

[5] Defense counsel sought to question Detective Markardt about the statements that the petitioner made while the detective was trying to advise him of his rights—that the petitioner was attacked by five drunk Mexicans—on the theory that his statements in the cell were a continuation of the earlier statements.  (Tr. at 625-26.)  He argued that the prosecutor should not be permitted to "cherry pick" portions of the statements, which counsel argued were made in the same place, around the same time, and part of the same interrogation.  (*Id*.)  The prosecutor responded that the statements were distinct; the first statement to Detective Markardt was during an interrogation, the second statement—which the prosecution argued was an "admission"—was not made to anyone in particular; Officer Franco just happened to be nearby. (*Id*. at 631.)  Observing that the question was "extremely close," Judge Chun denied the petitioner's application because the statements were not part of a single interrogation; the interrogation ended when Detective Markardt ended the interview and moved the petitioner to a holding cell.  (*Id*. at 637-38.)

### b.   The Defense's Case

Detective Alfredo Hidalgo interviewed Ben Smith, an eyewitness, on November 12, 2007.  Smith told the detective that he saw one of the three male Hispanics holding what he thought was a bottle.  (*Id.* at 894.)[6]

### c.   Jury Instructions and Verdict

Judge Chun charged the jury on the elements of second degree murder, first degree manslaughter and criminal possession of a weapon in the fourth degree.  (Tr. at 1004-10.)[7] Judge Chun also charged the jury on the defense of justification, using the standard language from New York's pattern jury instructions.  (*Id.*)[8]  In addition, Judge Chun gave a limiting instruction on the evidence of the petitioner's uncharged criminal conduct:

---

[6] Ben Smith testified on the prosecution's case that he did not remember telling the detective that he saw someone holding a bottle.  (Tr. at 699.)

[7] The court instructed the jurors to consider the charges in the alternative: that they should consider the manslaughter charge only if they found the petitioner not guilty of murder and the weapons charge only if they found the petitioner not guilty of manslaughter.

[8] New York's Penal Law defines the circumstances under which the use of physical force and deadly force may be justified:

1. A person may . . . use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person, unless:
> (a) The latter's conduct was provoked by the actor with intent to cause physical injury to another person; or
> (b) The actor was the initial aggressor; except that in such case the use of physical force is nevertheless justifiable if the actor has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident by the use or threatened imminent use of unlawful physical force; or
> (c) The physical force involved is the product of a combat by agreement not specifically authorized by law.

2. A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless:
> (a) The actor reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating;
> . . .

> There's also evidence in this case that on another occasion the defendant engaged in criminal conduct on the previous Halloween, and also that the defendant may be involved with the Cash Money Gang.  That evidence was not offered and must not be considered for the purpose of proving that the defendant had a propensity or predisposition to commit the crimes charged in this case.  They were offered as evidence for your consideration on the limited question of determining the perpetrator's identity, intent, motive, or to complete the narrative by providing background information.  If you find the evidence believable, you may consider it for those limited purposes and for none other.

(Tr. at 995.)

On October 3, 2008, the jury acquitted the petitioner of second degree murder and convicted him of first degree manslaughter.   (*Id.* at 1046-47.)

### d.      Post-Verdict Motion

At sentencing on October 29, 2008, the defense counsel made an oral application to set aside the verdict pursuant to Criminal Procedure Law § 330.30.  (ECF No. 7-3 at 508.)  He argued that the court's *Sandoval* ruling permitting the prosecutor to ask the petitioner about a ten-year-old assault prevented the petitioner from testifying, and that the court should not have allowed testimony about the petitioner's knifepoint threat of a teenager, his membership in the Cash Money Boys gang, or that he sold drugs with Jonathan Burgos and Alex Santiago.  (*Id.* at 509-10.)  Finally, he challenged certain evidentiary rulings.  (*Id*. at 511-12.)  Judge Chun denied the motion.  (*Id*. at 512.)

---

N.Y. Penal Law § 35.15 (2004).  Judge Chun denied the prosecutor's application to add additional language to the duty to retreat.

e.      **Sentence**

Judge Chun sentenced the petitioner as a predicate violent felon to a determinate prison term of 22 years and five years post-release supervision.  (EFC. No. 7-3 at 527; ECF No. 7-5 at 112.)[9]

## PROCEDURAL HISTORY

**I.   Post-Conviction Motions**

On July 31, 2013, the petitioner, proceeding *pro se*, moved to set aside his conviction pursuant to CPL § 440.10.  (ECF No. 7-4 at 2.)  He argued that his trial lawyer was ineffective because he did not introduce the petitioner's medical records—which documented treatment in 2000 for a gunshot wound to his left knee—into evidence.  (*Id*.)[10]  According to the petitioner, these records would have shown that he could not have retreated from Rosario, Algarin and Javier Aquino.  (*Id*. at 9, 13.)  Judge Chun denied the petitioner's motion in a written decision on December 23, 2013.  (*Id*. at 25.)

On November 29, 2017, the petitioner moved *pro se* to vacate his sentence pursuant to CPL §§ 440.20 and 440.30.  (ECF No. 7-5 at 88-95.)  He argued that his sentence—a determinate term of 22 years with five years of post-release supervision—exceeded the 25-year statutory maximum for a Class B Felony.  (*Id*. at 94-95.)  Judge Chun denied the motion on April 5, 2018, finding that "there is no evidence that there was a mistake or an error regarding the sentence."  (*Id*. at 132-35.)

---

[9] Judge Chun denied the prosecutor's application to sentence the petitioner as a discretionary persistent felony offender.  (EFC. No. 7-3 at 503, 514.)

[10] The records of the petitioner's treatment after the stabbing were in evidence.  (Tr. at 858-59.)

## II.  Direct Appeal

The petitioner, represented by counsel, appealed his conviction to the Appellate Division, Second Department.  (ECF No. 7-4 at 27.)  He argued that evidence of his gang membership together with testimony about the knifepoint threat to a teenager denied him due process.  (*Id.* at 63.)  He also challenged the sufficiency of the evidence, claimed that his sentence was excessive, and attacked his lawyer's failure to introduce the petitioner's medical records into evidence.  (*Id.* at 69, 78, 83.)

On April 15, 2015, the Appellate Division unanimously affirmed the petitioner's conviction, *People v. Bruno*, 127 A.D.3d 986 (2d Dep't 2015), concluding that the probative value of the disputed evidence—the petitioner's gang membership and his attack on a teenager the week before the killing—"outweighed any prejudice to the defendant," because it "was relevant to the issue of the defendant's motive and to his claim of justification, and explained the relationship between the parties."  *Id.* at 986.  The court also found that the evidence was "legally sufficient to disprove the defendant's justification defense and to establish the defendant's guilt beyond a reasonable doubt," that the sentence was not excessive, and that the ineffective assistance of counsel claim could not be reviewed on direct appeal.  *Id.* at 987.

On April 6, 2016, the Court of Appeals denied the petitioner's application for leave to appeal, *People v. Bruno*, 27 N.Y.3d 993 (2016), and on October 3, 2016, the United States Supreme Court denied his petition for writ of certiorari.  *Bruno v. New York*, 137 S. Ct. 109 (2016).

## IV.  Coram Nobis Petitions

The petitioner filed multiple *pro se* motions for writs of error *coram nobis* alleging ineffective assistance of appellate counsel on various grounds.  In a January 5, 2016 motion, the

12

petitioner argued that his appellate counsel did not share the prosecutor's brief or the Appellate Division's decision with him, and did not seek leave to appeal to the Court of Appeals.  (ECF No 7-4 at 145-46.)  He also claimed that his appellate counsel should have raised an ineffective assistance claim based on trial counsel's decision not to call a witness who allegedly saw Rosario, Algarin and Aquino throwing bottles at the petitioner as a defense witness.  (*Id.* at 155.)  In a December 28, 2016 motion, the petitioner attacked his appellate lawyer's decision not to challenge the trial court's ruling on the admissibility of the petitioner's gang membership.  (*Id.* at 212-29.)  The petitioner complained about his appellate lawyer again in a June 29, 2017 motion, and also challenged the trial court's jury instructions on the duty to retreat.  (ECF No. 7-5 at 1-46.)  In a fourth motion on November 29, 2017, the petitioner argued that appellate counsel should have challenged the trial court's charge on justification and the admission of the petitioner's post-arrest statement on "rebuttal," and argued that the evidence was insufficient.  (*Id.* at 144.)  In a fifth motion, on March 3, 2018, the petitioner claimed that appellate counsel should have argued that the prosecution violated double jeopardy.  (*Id.* at 247-63.)

The Appellate Division denied each motion because the petitioner "failed to establish that he was denied the effective assistance of appellate counsel."  *People v. Bruno*, 139 A.D.3d 751 (2d Dep't May 4, 2016); *see also People v. Bruno*, 150 A.D.3d 1140 (2d Dep't May 24, 2017); *People v. Bruno*, 156 A.D.3d 650 (2d Dep't Dec. 6, 2017); *People v. Bruno*, 161 A.D.3d 766 (2d Dep't May 2, 2018); *People v. Bruno*, 164 A.D.3d 695 (2d Dep't Aug. 15, 2018).

On October 11, 2020, the petitioner made a sixth motion, which is apparently pending. (ECF No. 36 at 24.)[11]

## V.    Habeas Petition

On March 8, 2018, the petitioner filed this petition, in which he claims that the evidence of his gang affiliation and his prior attack on a teenager denied him due process.  (ECF No. 1 at 11.)  He also challenges the sufficiency of the evidence (*id*. at 50), the trial court's jury instructions (*id*. at 64), and its ruling that the prosecution could introduce the petitioner's post-arrest statement (*id*. at 70).[12]  He renews his attack on his appellate counsel (*id*. at 79), claims that his sentence was excessive (*id*. at 85), and that the jury's consideration of second degree murder and first degree manslaughter violated double jeopardy (*id.* at 86).

For the reasons that follow, the petition for a writ of habeas corpus is denied.

### LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a federal court reviewing a state prisoner's habeas petition to give deference to a state court's decision on the merits.  28 U.S.C. § 2254(a).  A federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also*

---

[11] On April 9, 2020, I denied the petitioner's request for a stay while he pursued state court remedies to challenge the trial court's jury instructions.  (ECF No. 34.)  I found that the petitioner had not established extraordinary circumstances to warrant either equitable tolling of the AEDPA statute of limitations or amendment of his original petition.  (*Id*. at 4-5.)  Similarly, I decline to stay this action while the petitioner pursues his sixth motion for a writ of error *coram nobis* (*see* ECF No. 36), because he has not explained why he could not have pursued this relief sooner.  *See Holland v. Florida*, 560 U.S. 631, 649 (2010).

[12] The petitioner characterizes this evidence as "rebuttal," but the prosecution did not put on a rebuttal case.  I interpret the petitioner's claim as a challenge to the introduction of his statements as part of the prosecution's case-in-chief.

*Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015).

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412-13. The court reviews the last reasoned state court decision. *Ylst v. Nunnemaker,* 501 U.S. 797, 804 (1991); *Jones v. Stinson,* 229 F.3d 112, 118 (2d Cir. 2000). The state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Moreover, a federal court must not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). This doctrine applies to both substantive and procedural state law grounds. *Id.* at 729-30.

Finally, a habeas petitioner must exhaust state court remedies, so that the state courts have a fair and full opportunity to review the merits of the claim. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court

capable of reviewing it" before filing his habeas petition. *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

## DISCUSSION

### I.    Due Process

The petitioner claims that the trial judge's evidentiary rulings and jury instructions deprived him of due process and a fair trial. (ECF No. 1 at 11, 64.)  Specifically, he argues that the judge should not have admitted evidence of his gang membership or about his conduct a week before the killing—holding a teenage boy at knifepoint. (*Id*. at 11.)  He also claims that the judge should not have permitted the prosecution to introduce his post-arrest statements. (*Id*. at 70.)

The petitioner raised only two of these claims on direct appeal—the evidence of his gang membership and the uncharged assault.  Because he did not present the other arguments to the state court, the claims are unexhausted. *See Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014).  I may consider these claims only if the petitioner "can first demonstrate either cause and actual prejudice, or that he is actually innocent." *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998)).  To show cause for procedural default, the petitioner must show "that some objective factor external to the defense impeded . . . [his] efforts to comply with the State's procedural rule." *Id*. (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)) (omissions in original).  To establish prejudice, the petitioner must demonstrate a "reasonable probability" that the outcome of the trial would have been different but for the alleged violation. *Edwards v. Superintendent, Southport C.F.*, 991 F. Supp. 2d 348, 367 (E.D.N.Y. 2013) (quoting *Strickler v. Greene*, 527 U.S. 263, 289 (1999)).  A miscarriage of justice occurs only in extraordinary cases, such as the conviction of a person who

is actually innocent.  *See Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002) (citing *Schlub v. Delo*, 513 U.S. 298, 321 (1995) (citation omitted)).

The petitioner has shown neither cause nor actual prejudice for his failure to challenge the admission of his post-arrest statements or the jury instructions on appeal.  Moreover, New York courts repeatedly rejected his various claims about his appellate lawyer.  Nor has he established that he is actually innocent; indeed, he has never denied that he stabbed and killed William Rosario, and the jury understandably rejected his justification defense.

In any event, the petitioner's claims fail on the merits.

### a. Evidentiary Rulings

Judge Chun granted the prosecutor's application to introduce evidence of the petitioner's gang membership, drug dealing with Burgos and Santiago, and the incident in which the petitioner threatened a teenager with a knife as part of their direct case.  (ECF No. 7-1 at 68-69.) The petitioner argues that this evidence was unfairly prejudicial and denied him due process. "[T]o establish that an erroneous application of state rules of evidence violates the federal guarantee of due process," the petitioner must "demonstrate that the state court's erroneous conclusions about New York evidence law were so egregious as to implicate the Fourteenth Amendment's guarantee of due process," as established by Supreme Court precedent.  *Evans v. Fischer*, 712 F.3d 125, 133 (2d Cir. 2013).  The petitioner has not met that burden.

Under New York law, "[e]vidence of a defendant's prior bad acts may be admissible when it is relevant to a material issue in the case other than defendant's criminal propensity." *People v. Dorm*, 12 N.Y.3d 16, 19 (2009).  The petitioner's "status" in the neighborhood was a significant motivating factor in the stabbing.  After a seemingly trivial argument, teenager Jonathan Burgos vowed to "get you know who"—referring to the petitioner—and another

teenager, Alex Santiago, threatened that Javier Aquino's "whole family [was] dead," because Santiago had "called you know who." Thus, the relationship between the petitioner and the group of teenagers was relevant. The evidence was also relevant on the issue of justification, particularly whether the petitioner was the initial aggressor. For that reason, Judge Chun found that evidence that Burgos and Santiago sold drugs for the petitioner, along with the evidence of the petitioner's knifepoint threat to the teenager, was relevant to prove his status as someone who "ran the block," and his motive to punish anyone who challenged him or confronted his underlings. (ECF No 7-1 at 67-68.) As Judge Chun also found, the petitioner's gang membership "complete[d] the narrative of the relationship of the individuals on the block." (*Id*. at 69.) Moreover, Judge Chun gave a limiting instruction on the purposes for which the jury could consider the evidence, thus ameliorating the possibility of undue prejudice.

The Appellate Division agreed that "the testimony . . . was relevant to the issue of the defendant's motive and to his claim of justification, and explained the relationship between the parties," and that "its probative value outweighed any prejudice to the defendant." *Bruno*, 127 A.D.3d at 986. That decision was firmly rooted in state law.

### b.  Jury Instructions

As part of his final charge, Judge Chun instructed the jury on the circumstances under which a person is entitled to use deadly physical force in self-defense, as well as the duty to retreat. (Tr. at 1000-04.) The petitioner says that those instructions violated due process.

The propriety of a state court's jury charge is ordinarily a matter of state law that does not raise a federal constitutional issue. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) ("[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief.") (citation omitted). Habeas relief is available only if the instruction "violated some right which

18

was guaranteed to the defendant by the Fourteenth Amendment," and not because the instruction is "undesirable, erroneous, or even 'universally condemned.'" *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).

A jury instruction violates due process if it does not "give effect" to the requirement that "the State must prove every element of the offense." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam) (citing *Sandstrom v. Montana*, 442 U.S. 510, 520-21 (1979)).  Trial counsel did not object to Judge Chun's charge; in fact, counsel argued that the charge, which was taken from New York's Criminal Jury Instructions, was correct.  Thus, this claim was not preserved. *See Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) (explaining that N.Y. Crim. P. L. § 470.05(2)—the contemporaneous objection rule—"is a firmly established and regularly followed New York procedural rule" that "constitutes an independent and adequate state law ground for disposing of a claim" that a defendant's constitutional right had been violated).  In any event, Judge Chun accurately described the prosecution's burden of proof, including its obligation to disprove the defense of justification, as well as the duty to retreat.  (Tr. at 1000-04.)  "The defendant would not be justified if he knew that he could, with complete safety to himself, avoid the necessity of using deadly physical force by retreating."  (*Id.* at 1004.)  That was an accurate description of New York's law, and did not violate due process.

### c.  Post-Arrest Statements

The petitioner's challenge to the admission of his post-arrest statement that he could "go four years standing on his head" and could "do push-ups all day long" (Tr. at 847) is similarly flawed.  Judge Chun ruled, after a hearing, that the statements were spontaneous and voluntary. (ECF No. 7-1 at 106-07.)  Not only is the petitioner's challenge unexhausted and procedurally barred, he has not established that the state court made "erroneous conclusions about New York

evidence law" which "were so egregious as to implicate the Fourteenth Amendment's guarantee of due process." *Evans v. Fischer*, 712 F.3d 125, 133 (2d Cir. 2013). "[I]n light of all of the evidence presented a trial," the admission of the petitioner's post-arrest statements "was not sufficiently prejudicial to render [the petitioner's] trial fundamentally unfair," and therefore does not provide a basis for habeas relief. *Griggs v. Lempke*, 797 F. App'x 612, 616 (2d Cir. 2020) (summary order).

## II.   Sufficiency of the Evidence

The petitioner argues that "[h]is conviction for First Degree Manslaughter [was] against the weight of the evidence presented at trial" because the prosecution did not "present sufficient evidence to prove beyond a reasonable doubt that the [petitioner] was not justified" in his use of deadly force. (ECF No. 1 at 50.)

An evidentiary sufficiency claim faces a "high bar" in federal habeas proceedings and is subject to "two layers of judicial deference[;]" not only does the fact finder have broad discretion to decide the case, but a state court's decision on a sufficiency of the evidence challenge should not be overturned unless it is "objectively unreasonable." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). Evidence is legally sufficient if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 309, 319 (1979) (emphasis in original) (citations omitted).

Under New York law, a person is guilty of first degree manslaughter if "[w]ith intent to cause serious physical injury to another person, he causes the death of such person or of a third person[.]" N.Y. Penal Law § 125.20(1). The use of deadly force may be justified if a person "believed that the use of deadly force was necessary[,]" and if "a reasonable person in the

20

defendant's circumstances would have believed that deadly force was required."  *People v. Umali*, 10 N.Y.3d 417, 425 (2008); *see also* N.Y. Penal Law § 35.15.  However, a person is not justified in using deadly force if he is the initial aggressor or if he knows that he can avoid the use of deadly force by safely retreating.  N.Y. Penal Law § 35.15(2)(a).

The evidence before the jury was sufficient to establish the elements of first degree manslaughter and disprove the petitioner's justification defense.  There was no dispute that the petitioner stabbed and killed William Rosario on November 12, 2007.  (*See* Tr. at 54.)  According to the trial testimony, the petitioner was the initial aggressor; he brandished a knife while repeatedly threatening Rosario and the other two men; he told them that they knew who he was, and that they were "dead."  (*Id.* at 464, 656, 743-44, 747.)  The jury understandably concluded that Rosario, Algarin and Aquino did not use deadly force merely by throwing bottles and garbage bags at the petitioner, and that he could have retreated without using deadly physical force.  Instead, he continued to swing the knife and threatened to kill them.  (*Id.* at 205, 746-47.)

The jury rejected the petitioner's justification defense and found him guilty of first degree manslaughter.  The only question under *Jackson* is whether that finding was "so insupportable as to fall below the threshold of bare rationality."  *Coleman*, 566 U.S. at 656.  The Appellate Division—affording "great deference to the opportunity of the finder of fact to view the witnesses, hear the testimony, and observe demeanor," *People v. Bruno*, 127 A.D.3d at 987—found that it was not.  That determination was not objectively unreasonable.

## III.    Excessive Sentence

The petitioner argues that his sentence—a determinate prison sentence of 22 years with five years of post-release supervision—exceeded the 25-year statutory maximum for a Class B violent felony.  It did not.  In any event, this is purely an issue of state law, which is not

cognizable on federal *habeas* review.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today,

we reemphasize that it is not the province of a federal habeas court to reexamine state-court

determinations on state-law questions."); *Kravitz v. Rabsatt*, No. 12-CV-719, 2014 WL 4365280,

at *7 (N.D.N.Y. Aug. 28, 2014) (claim that sentencing court failed to pronounce sentencing on

each count for which petitioner was convicted was "purely issue[ ] of state law and as such,

[was] incognizable on federal habeas review"); *Jenkins v. Stallone*, 2015 WL 1788713, at *7 n.8

(N.D.N.Y. Apr. 17, 2015) (a claim based on an "alleged failure to meet the requirements of

C.P.L. 380.20" would not be cognizable on habeas corpus review because "federal habeas relief

does not lie to correct errors of state law"); *Mazariego v. Kirkpatrick,* No. 16-CV-2290, 2017

WL 3206321, at *13 (E.D.N.Y. July 26, 2017) (same).

## IV.    Double Jeopardy

The petitioner argues that the jury's consideration of murder and manslaughter violated

double jeopardy.  He raised this claim for the first time in his March 3, 2018 *coram nobis*

motion, but did not raise it on direct appeal.  Thus, the claim is unexhausted and procedurally

barred.  It also fails on the merits.

The double jeopardy clause does not preclude a jury from considering both murder and

manslaughter, as the jury did here.  Rather, it precludes multiple prosecutions for the same

offense.  Thus, if the prosecutor had charged the petitioner only with murder for the killing of

William Rosario, she could not have brought a second case for manslaughter.  *See Burks v.*

*United States*, 437 U.S. 1, 11 (1978) ("The Double Jeopardy Clause forbids a second trial for the

purpose of affording the prosecution another opportunity to supply evidence which it failed to

muster in the first proceeding.").  In this case, the trial court submitted both charges to the jury,

which acquitted him of murder and convicted him of first degree manslaughter.  *See People v.*

22

*Suarez*, 40 A.D.3d 143, 151 (1st Dep't 2007) ("[I]mplicit in the notion of charging and submitting lesser included offenses and having a jury consider offenses in decreasing order of culpability is that it may decide to acquit of a higher count and convict on a lesser one.").

## V.   Ineffective Assistance of Appellate Counsel

The petitioner renews his claims that his appellate lawyer was ineffective, presumably because counsel did not argue that "the trial court erred when it limited the jury's consideration of [his] self-defense claim." (ECF No. 1 at 79.)  The petitioner made this claim in his third and fourth motions for a writ of error *coram nobis*, which the Appellate Division rejected.[13]

A petitioner claiming that his lawyer was ineffective must meet the two-pronged test articulated in *Strickland v. Washington*: (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. 668, 694 (1984).  The Supreme Court has advised that in state habeas petitions this inquiry is "different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  Rather, state courts must be granted a "deference and latitude that are not in operation when the case involves a review under the Strickland standard itself."  *Id*.  A federal court "must determine what arguments or theories supported, or . . . could have supported, the state court's decision," and must then determine "whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court.  *Id*. at 102.  The standard was "meant" to be an exacting one; a state habeas petitioner must demonstrate that the state

---

[13] It is not clear if the petitioner seeks habeas relief for ineffective assistance of appellate counsel based on any of the other reasons raised in his earlier *coram nobis* petitions. If he is seeking such relief, it would be denied for the reasons outlined in this section.

court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *Id*. at 102-03; *see also Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) ("The prisoner must show that the state court's decision is so obviously wrong that its error lies beyond any possibility for fairminded disagreement." (quotation and citation omitted)).

Under the first prong of *Strickland*, "[a] convicted petitioner . . . must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "Judicial scrutiny of counsel's performance must be highly deferential," and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. "[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy." *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986)).

To satisfy the second prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The level of prejudice the [petitioner] need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 693). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

 "To establish prejudice in the appellate context, a petitioner must demonstrate that there was a reasonable probability that his claim would have been successful" before the state's

highest court. *Hemstreet v. Greiner*, 367 F.3d 135, 142 (2d Cir. 2004), *vacated on other grounds*, 378 F.3d 265 (2d Cir. 2004); *see also Sellan v. Kuhlman*, 261 F.3d 303, 317 (2d Cir. 2001) ("[The] process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." (internal quotation marks omitted)).  In other words, appellate counsel cannot be ineffective for failing to advance a meritless claim.  Judge Chun's instructions on the justification defense—which was the instruction that counsel requested—complied with state law.  Thus, there was nothing for appellate counsel to challenge.

## CONCLUSION

Accordingly, the petition for a writ of habeas corpus is denied in its entirety and the case is dismissed.  A certificate of appealability will not be issued.  *See* 28 U.S.C. § 2253(c).  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith.  *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).  The Clerk of Court is respectfully directed to enter judgment and close this case.

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
       March 9, 2021